IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OVERSEAS CARRIERS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-2842 |
| | § | |
| TEAM OCEAN SERVICES-DALLAS, | § | |
| INC., TEAM OCEAN SERVICES, INC., | § | |
| and TEAM WORLDWIDE, INC., | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After all parties have rested and closed the evidence, and having considered the trial briefs and heard and considered the oral arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## Findings of Fact

The Court has carefully considered the testimony at trial and the numerous documents received in evidence, which in aggregate have provided both direct evidence and a considerable amount of circumstantial evidence and, after having carefully weighed and evaluated the same, the Court makes the following Findings of Fact from a preponderance of the credible evidence:

<u>The Parties and Their Principals</u>

1.  Plaintiff Overseas Carriers, Inc. ("OCI") is a Delaware corporation authorized to do business in Texas which, at all material times, was in the business of chartering and operating vessels for the movement of cargo worldwide.

2.  OCI's principal owner and President was James O. "Jim" Pearcy, who had long experience in the industry and had owned his own business for approximately 15 years.

3.  Well after the events of 2009 that gave rise to this maritime action, Pearcy died on January 28, 2011, at the age of 79.

4.  Pearcy's unexpected sudden death occurred exactly fourteen days after the Court held an initial Rule 16 Scheduling Conference in this case and, hence, Pearcy never gave his testimony, even by deposition.

5.  Ms. Maria Pearcy, the wife of Jim Pearcy when he died, succeeded him as the major owner of OCI; Ms. Pearcy is an employee of the Harris County Juvenile Probation Office and OCI has not actively been in the vessel charting business since Jim Pearcy's death.

6.  Defendant Team Ocean Services, Inc. ("TOS") is a privately owned Texas corporation authorized to do business in the State of Texas, with its headquarters located in Winnsboro, Texas, located about 100 miles east of Dallas.

7.   TOS is a freight-forwarder and non-vessel operating common carrier ("NVOCC"), which has employees not only in Winnsboro but also in various branch offices throughout the United States.

8.   TOS, as a non-vessel operating common carrier, was licensed by the Federal Maritime Commission as an ocean transportation intermediary in accordance with the Shipping Act of 1984, 46 U.S.C. § 40101 *et seq.*, and pursuant to 46 C.F.R. § 515.

9.   TOS's Ocean Transportation Intermediary license number is 4247 N.F.

10.  TOS has a branch office in Grapevine, Texas, which is situated between Dallas and Fort Worth in proximity to DFW Airport, which TOS referred to as its "Dallas" or "DFW" office.

11.  At all material times to this case, J.J.S. Logistics, LLC, which was owned by Jim Sandifer and his wife, was the sales agent for TOS in its Dallas office.

12.  Although Jim Sandifer ("Sandifer") was the acting principal for J.J.S. Logistics, LLC, he did business under the name of TOS as the owner and head of TOS's Dallas office.

13.  As sales agent for TOS, Sandifer was authorized by his Sales Agency and Branch Office Agreement with TOS to engage in direct solicitation on behalf of TOS for the performance of licensed ocean transportation intermediary services, including both NVOCC and ocean-freight forwarding services, of export

and import cargo for ocean transportation between the United States and ports and points in countries not including the United States.

14. The Sales Agency and Branch Office Agreement between TOS and Sandifer states that the parties intended an independent contractor relationship and that Sales Agent could not enter into any contracts with third parties as Team Ocean Services, Inc., but this was a private Agreement between TOS and Sandifer.

15. What was presented to third parties such as OCI and to the public, pursuant to Sandifer's Sales Agency Agreement, were all the trappings of a TOS Dallas office where Sandifer was in charge; the Sandifer Sales Agency and Branch Office Agreement required Sandifer to conduct all of the office's functions exclusively under the name of Team Ocean Services, Inc., to maintain a dedicated phone line listed, answered and billed to "Team Ocean Services," and to assure that all letterhead used by his office and as sales agent was imprinted with the name "Team Ocean Services, Inc.," together with TOS's valid Ocean Transportation Intermediary number, OTI 4247NF.

16. Sandifer himself was to perform only sales work and he himself was not to perform as an ocean transportation intermediary as defined in the United States Code of Federal Regulations at 46 C.F.R. § 515.

4

17.  To perform the duties of an Ocean Transportation Intermediary in TOS's Dallas office, including those of a NOVCC and as a Freight Forwarder, TOS hired Paul Powell.

18.  Powell, unlike Sandifer, was an employee of TOS, not an independent contractor.

19.  Powell had begun his work in this industry with a separate company in 1990 when he was hired as an ocean export supervisor.  After Powell had gained some 17 years of industry experience with several employers, TOS hired him in June 2007 as its International Manager for the Dallas office, where the volume of ocean business in that office justified the employment of someone experienced in ocean freight transportation.

20.  Powell in behalf of TOS was required, among other things, to perform the duties customarily performed in the industry by a licensed ocean transportation intermediary, including those duties set out in the rules and regulations of the Federal Maritime Commission, to work closely and coordinate shipment transactions with the agents designated by TOS, and to recap promptly all ocean shipments in a form and manner as directed by TOS.

21.  Powell at the time of the events giving rise to this case worked under the direct supervision of Jim Sandifer, head of the Dallas office, who regarded Powell as a hard working and

forthright employee, who managed the people under him and arranged the carriage of ocean freight, and with whom Sandifer had no problems.

22. Sandifer and Powell both officed in TOS's Dallas office located at 1104 East Dallas Road, Suite 100, Grapevine, Texas 76051, in proximity to DFW Airport.

23. TOS also used the term "Team Worldwide" as a marketing name for TOS and for two or three other entities in the same ownership group.

24. TOS's fax machine at its Dallas office therefore bore the name, "Team Worldwide / DFW," at 817-442-4978.

25. Although Sandifer was identified as head of its Dallas office, there is no evidence that TOS took any action to delineate to third parties with whom Sandifer and Powell had dealings the distinctions that TOS internally made between Sandifer (independent contractor) and Powell (TOS's employee).

26. TOS's president Randy Honeycutt testified that TOS's internal corporate policies with respect to matters such as these were "none of the business" of TOS's customers.

<u>The Contract of Affreightment</u>

27. TOS's core business is selling and performing the services of a freight-forwarder and non-vessel operating common carrier

6

licensed by the F.M.C. as an ocean transportation intermediary.

28. TOS approved OCI as a vendor for TOS.

29. TOS's President at the time of the events giving rise to this case was Randy Honeycutt. President Honeycutt, who officed in Winnsboro, Texas, knew OCI's Jim Pearcy and was favorably impressed by Pearcy's experience and capabilities in chartering and operating vessels for the ocean movement of cargo. Honeycutt had dealt with Pearcy and traveled with him on business matters and, before the events in this case, he invited Pearcy to attend a TOS corporate meeting in Boston in July, 2008, which invitation Pearcy accepted.

30. Keith Buford was TOS's Vice President of Sales, in direct charge of TOS's core business of selling and performing the services of a freight forwarder and ocean transportation intermediary.

31. In late 2008 or early 2009, TOS's Vice President of Sales, Keith Buford, Jim Sandifer, and Paul Powell came to Houston (OCI's office was in neighboring Seabrook) where they had a business meeting over lunch with OCI's Pearcy. It was at this meeting that TOS's Vice President Buford introduced Sandifer and Powell to Pearcy. Sandifer was introduced as the owner in charge of TOS's Dallas office, and Powell was introduced as TOS's International Manager, who handled ocean freight for TOS

in its Dallas office, and with whom Pearcy would work when he was contacted by TOS for the carriage of ocean freight.

32. Sandifer, in the presence of TOS's Vice President Buford, told Pearcy that he, Sandifer, at the end of the day made the decisions and that if Pearcy had any problems in his dealings with Powell on ocean freight matters, that he should come to Sandifer.  TOS's Vice President Buford made no response to qualify or limit Sandifer's statement, a further manifestation by Buford in behalf of TOS that Sandifer was in fact the final authority to act for TOS in the conduct of its ocean freight transportation business generated through its Dallas office.

33. At about this time and in the Spring of 2009, Great American Silica Company was negotiating to sell to China large volumes of silica, frac sand, and rock pellets, and Sandifer and Powell, as part of their duties for TOS, were actively negotiating a contract with the Great American Silica Company for TOS to ship those large bulk volumes of products for Great American from ports in the United States to ports in China.

34. TOS's President Honeycutt was aware that Sandifer and Powell were engaged in these ongoing efforts for TOS.

35. As their efforts progressed to acquire the silica transportation deal, Powell had ongoing discussions with OCI's Pearcy, whose company TOS had approved as a vendor for TOS,

regarding the ocean shipments that would be required on the Great American Silica Company deal.

36.  On May 5, 2009, Powell sent a business email to Pearcy giving his "latest update" on TOS's project, in which Powell reported the following:

> "1.   The first contracting consignee concluded a visit here with our customer yesterday and they have completed their negotiations on the material and are ready to move forward quickly.  The final governing letter of credit will be in the hands of our customer on or before the 15th of May, 2009.

> "2.   The total volume of the first contract is for a total of five million metric tons of bulk material.

> "3.   Shipping of the material from the origin locations up to the port for ocean vessel loading will commence on or about the 18th of May and will continue at the pace of transportation availability until the end of the full contract.

> "4.   Mutual extensions of the contracts were also agreed to with final volumes to be determined 60 days prior to the expiration of the working contract."

37.  After receiving further details and having further discussions and negotiations with TOS's Powell in May, Pearcy requested his executive secretary, Elizabeth Anne Slaughter, to use the form of a GENCOA Standard Contract of Affreightment for dry bulk cargo, and to enter the terms he gave her to draft a Contract of Affreightment ("COA") that he believed would meet TOS's anticipated requirements as related to him by Powell.

38.   Powell's employment agreement with TOS required him, among other things, to perform the duties customarily performed by a licensed ocean transportation intermediary, and Powell's negotiations with OCI were within the scope of his actual authority and in furtherance of TOS's business.

39.   Pearcy knew that Powell reported to Sandifer, whom TOS's Vice President Buford had introduced to Pearcy as owner in charge of TOS's Dallas office, and Pearcy therefore directed that the COA be prepared for Sandifer's signature.

40.   The proposed Contract of Affreightment was dated May 14, 2009, identified Jim Sandifer and Team Ocean Services-Dallas, Inc. as the counterparty, by which the parties intended Team Ocean Services, Inc., acting through its Dallas office.  Team Ocean Services, Inc. was in fact the counterparty.

41.   The proposed Contract of Affreightment went on to describe the cargo as Powell had described it to Pearcy--up to five million metric tons of silica sand, frac sand, specialized gravel, and rock pellets in bulk from ports in the United States to China, in as many as 100 equal shipments of at least 50,000 metric tons per shipment, with the contract period to run from May 26, 2009 through May 25, 2010, Evergreen beyond, with the first shipment scheduled for the time frame May 25-June 2, and the second shipment June 16-June 23.  The freight rate was set at $47 U.S.D. per metric ton, with a 50,000 metric ton minimum

per shipment.   Twenty-five percent (25%) of the freight
payment was to be made when the contract was executed, 65%
when the first vessel was loaded, trimmed, and pilot on board
ready to sail, and 10% when the vessel arrived sea buoy at the
destination port.   This procedure was to be followed for the
first three vessels, with 25% to be paid five days before
LayCan.   The contract included additional terms for demurrage,
bunker price adjustment, notices, and the like.

42.   The Contract of Affreightment also contains an arbitration
clause, providing that any dispute arising out of or in
connection with the contract shall be referred to arbitration
in Houston, Texas, with United States law to apply.

43.   At Pearcy's request, Ms. Slaughter conveyed the proposed
Contract of Affreightment to TOS at its Dallas office, where
Sandifer and Powell both had their offices.

44.   On June 5, 2009, OCI received in its offices a faxed copy of
the signature page of the COA, which was sent from Team
Worldwide / DFW's fax number 817/442-4978, the fax machine TOS
maintained in its Dallas office.

45.   The signature page bore what purported to be the signature of
Jim Sandifer, for Team Ocean Services, with the title of
"Owner" of Team DFW (i.e., TOS's Dallas office), consistent
with how TOS's Vice President of Sales had introduced Sandifer
to Pearcy a few months earlier.

46.  Jim Pearcy signed the signature page as President of Overseas Carriers, Inc. and dated his signature 6-5-09.

47.  According to Ms. Slaughter's testimony at trial, Pearcy was so happy when TOS executed the COA and delivered to him the signed signature page that he did a dance around the office.

## Ensuing Events

48.  Although the COA called for an initial 25% payment for the first voyage, which would have amounted to $587,500 (50,000 metric ton minimum times $47 per metric ton X 25%), TOS did not make a wire transfer of that sum to OCI.

49.  Pearcy began urging TOS's International Manager Powell to make the required initial payment for the first voyage.

50.  After a rather bizarre series of events in July, which included instructions that Powell gave both to Pearcy and to Pearcy's executive secretary Ms. Slaughter to prepare four invoices to TOS, to the attention of Paul Powell, International Manager, for payments on four putative shipments that totaled $252,300, to procure partial payment on the COA[1]; the receipt by OCI of payments on those invoices; and further assurances from Powell of impending payments on the COA that

---

[1] Some unexplained oddities such as this may be pertinent to performance of the COA and possible defenses to Plaintiff's claims on the merits, but the issue before this Court is simply whether a COA was formed.

12

TOS would be making, OCI, in reliance on the COA and Powell's continued assurances to Pearcy, entered into a time charter for the Gypsum Centennial in a Charter Party dated August 7, 2009.

51. A week later, Gypsum Transportation Limited, with whom Pearcy made the Charter Party for the Gypsum Centennial, sent to OCI an email with accompanying invoice, to the attention of Pearcy, requesting the initial hire payment due under the Charter Party by August 17, 2009.

52. Pearcy, in turn, began forwarding to TOS's Powell the invoices for payment by TOS. Powell, at all times acting as International Manager for TOS at Team Worldwide-DFW, TOS's Dallas office, and using his "Team Worldwide" email account, on August 25 forwarded to Pearcy an email from "my corporate accounting department" reporting that wire transfers were attempted to The Bank of Bermuda through Chase Bank for credit to Gypsum Transportation but had not been completed due to erroneous bank account information for Gypsum Transportation.

53. On August 28, Powell emailed to Pearcy what he represented was a wire transfer confirmation of $683,764.21 through Wells Fargo Bank N.A., Irving, TX. to Gypsum Transportation's account in The Bank of Bermuda, for payment on the Gypsum Centennial vessel hire, and Pearcy forwarded the email to

Gypsum Transportation, asking the latter to "pull from your end and we will push from ours."

54. On September 1, Powell sent to Pearcy what he represented was a wire transfer confirmation from JPMorgan Chase Bank for $475,000 to the credit of Gypsum Transportation's account in The Bank of Bermuda, on the Gypsum Centennial hire.

55. None of these transfers was made, and by September 4, Powell was sending more emails with attachments purportedly signed by Linda Wilkins in TOS's Winnsboro headquarters office, assuring wire transfers on the Gypsum Centennial hire of $200,000 on the morning of September 8 and $300,000 by the end of that day, and the balance of the 30-day charter hire and fuel to be paid by the end of the day September 10.

56. These series of promises, representations, and assurances from TOS's Powell that continued through the first week of September were all for naught because TOS made no payments and none was received.

57. About September 8 or 9, 2009, TOS's President Randy Honeycutt learned of the hired vessel in Mobile, Alabama, awaiting payment and prepared to accept the cargo. He flew to Houston to meet with Pearcy on the afternoon of September 10. Pearcy met Honeycutt at or near George Bush Intercontinental Airport, and briefed him on the status of the transaction and the chartered vessel in Mobile, and recounted to Honeycutt the

bogus documentations that Pearcy and the vessel owner had received from TOS's Powell regarding wire transfers of funds that were not received, and Powell's unfulfilled promises of payments by TOS. Pearcy brought with him and showed to Honeycutt printouts of numbers of these documents that Powell had sent from his "Team Worldwide" email account. Honeycutt told Pearcy he planned to meet with TOS Dallas personnel by 10:00 a.m. the next day.

58. After his meeting with Honeycutt, Pearcy that afternoon sent an email to Ian Vallender, Director-Operations of Gypsum Transportation Limited, reporting that Honeycutt was informed of the charter hire and fuel bill due, and also of the dockage charges, and that Honeycutt wanted to "straighten out this situation soonest."

59. Honeycutt testified at trial that Pearcy did not bring with him to George Bush Intercontinental Airport the COA that had led to OCI chartering the vessel, but there is no credible evidence that Pearcy had any reason to believe during his meeting with Honeycutt that there was any dispute or question about the COA. Pearcy had no reason to believe that when Honeycutt came to Houston to meet Pearcy that he did not know about the COA. The urgency of the meeting--indeed the critical situation at hand--and OCI's understandable response through Pearcy--was all focused upon the chartered vessel and

its standby status in Mobile at a rate of $20,250 daily, the accumulating charter hire bills and fuel bills that were due, and Powell's unfulfilled claims of wire transfers and payments that TOS had sent or caused to be sent, along with Powell's string of false representations.

60. Honeycutt at trial further testified that Pearcy at their George Bush Intercontinental Airport meeting said something to the effect that Honeycutt didn't need "to worry about it" because he was not going to be liable.  Again, the entire focal point of that meeting was the chartered vessel standing by at Mobile and the Charter Party upon which OCI was the direct obligor as the charterer, and hence Pearcy was pointing out his own liability on the Charter Party incurred at the instance of TOS.  Pearcy was not saying that Honeycutt's company--TOS--was not liable on the COA, and if Honeycutt was attempting to imply as much, his testimony to that effect is not credible.

61. Indeed, there is documentary evidence that Honeycutt had gathered from Powell some information about the transaction before he flew to Houston for his airport meeting with Pearcy. In a middle-of-the-night email from Powell to Honeycutt bearing a time mark of 1:14 a.m. on September 10, Powell assured Honeycutt that TOS "already [had] in place with the shipper" a contract of private carriage for the shipment of at

least 45,000 metric tons of silica sand/gravel/rock per shipment, with at least two shipments per month, for up to 36 months. Powell sent to Honeycutt an unsigned copy of the TOS/Great American Silica Company contract, offered to send to him a signed copy if he wished, and told Honeycutt of "the customer's agreement to pay all additional charges for the delay to the vessel caused by their inability to finalize payment through their letter of credit."

62. Thus, before coming to Houston to meet Pearcy on September 10, Honeycutt knew of the deal between Great American and TOS--or at least what his International Manager Powell told him about it--and knew that OCI was TOS's counterparty to fulfill the ocean carriage of the bulk freight, and that OCI, in turn, had chartered the Gypsum Centennial at TOS's instance for the first shipment.

63. After his meeting with Pearcy in Houston on September 10, Honeycutt flew back to Dallas to meet with Powell regarding the situation.

64. After meeting with Powell on September 10, and--according to Honeycutt's email quoted below, following some communication with representatives of Great American and its banks-- Honeycutt very late that same night sent an email to Ian Vallender, Director-Operations, for Gypsum Transportation Limited, in which Honeycutt himself represented his belief

17

that money for the charter hire was on the way.  Honeycutt wrote:

> Needless to say this whole matter has not been handled professionally in any manner and I can only offer my sincerest apologies.  Now having said that, you and I both [know] that doesn't mean anything if this doesn't close out correctly.  I am currently under the impression from the banks and the customer that this money is being transferred to Team Ocean Services in the am from Utah.  As soon as this money is wired into our account, we will make the necessary arrangements to get you your money in whatever manner you require that is possible.  I will call you at whatever number you advise and we will line out the final details.

65.  The next morning, on September 11, Vallender of Gypsum Transportation Limited, thanked Honeycutt for his assurances and agreed that his company, like TOS, also was "keen to get this matter resolved and to go forward with this contract and to put the unfortunate initial experience behind us." Vallender in his reply to Honeycutt included Gypsum Transportation's correspondent bank, ABA code, bank account number, and other such information to facilitate Honeycutt's transfer of TOS's funds directly to Gypsum Transportation.

66.  In the late afternoon on September 11, 2009, Honeycutt emailed Vallender that he believed the customer had not transferred money to TOS, and that the charter ship should be terminated immediately.

67.  On Monday, September 14, 2009, after meeting with Sandifer in the Dallas office, Honeycutt met with Powell and terminated Powell's employment.

68.  In his formal termination letter to Powell, Honeycutt stated Powell was terminated "[d]ue to the unauthorized actions you have participated in with Overseas Carriers, Inc." Honeycutt's letter to Powell went on to state:

> No Team Ocean Services, Inc. employee is allowed to sign a charter vessel contract, ocean rate contract, or any other legal documents on behalf of Team Ocean Services, Inc.  A corporate officer of Team Ocean Services, Inc., Winnsboro, TX, must sign the aforementioned documents.

69.  Sandifer denies that he signed the signature page on the COA that was faxed on June 5, 2009, from TOS's Dallas office back to OCI, and denies that he authorized anyone to sign his name to the COA.

70.  Sandifer did not sign the COA.

71.  TOS determined that it was Powell's actions as its International Manager that caused OCI to charter a vessel, which OCI chartered to fulfill its own obligations to TOS under the COA.

72.  Powell signed Sandifer's name on the COA, and Powell caused the signature page then to be faxed back to OCI from TOS's fax machine in its Dallas office.

73. This was the first transaction that OCI's Pearcy had had with TOS's Dallas office or with Sandifer and Powell.

74. Pearcy did not know or have reason to know or recognize Sandifer's actual signature, and did not know that the COA had not been signed by Sandifer.

75. OCI and Pearcy did not know and did not have reason to know of TOS's internal arrangements as respects any limitations on Sandifer's authority as owner of TOS's Dallas office to sign and bind TOS to contracts that pertain to the core, routine business that TOS conducted through its Dallas office.

76. Honeycutt at trial attributed to Pearcy, who died before his testimony could be given, knowledge that only Honeycutt or other corporate officers--presumably in Winnsboro--could sign contracts in behalf of TOS.   The Court does not find Honeycutt's testimony on this point credible, notwithstanding Honeycutt's claims of his having had interactions with Pearcy on shipments that did not come to fruition in the TOS Miami office, for several reasons: Pearcy had many years of experience in the ocean freight business, contracts of affreightment, and chartering of vessels; it defies common sense to believe that a person of Pearcy's experience in the industry would have undertaken to charter a vessel without having been satisfied that he had a duly signed contract or its equivalent in accordance with accepted maritime customs

and practices; Honeycutt conceded at trial that he could not say that he had ever previously told Pearcy that he, Honeycutt, had to be in on or sign all contracts for TOS; and further, it was not until September 18, 2009--after Honeycutt had ordered that the charter party be terminated and after he had fired Powell--that Honeycutt advised both Pearcy and Sandifer by email, as follows:

> I have been requested to send both of you a formal notification that only Team Ocean Services corporate officers can sign any booking, charter, or any contractual agreements.  In addition, I would like to be involved in the creation of any agreements prior to them being submitted and negotiated with any customers.

77.  In a separate contemporaneous email from Honeycutt to Sandifer, Honeycutt remarked, "This [the above quoted email to Pearcy and Sandifer] was more for pearcy (sic) than it was for you.  But I wanted to soften the blow by adding you."

78.  Honeycutt wanted to "soften the blow" to Pearcy because he had not previously told Pearcy of any such TOS policy.

79.  Before June 5, 2009, when OCI received from TOS the signed signature page of the COA, Pearcy did not know that Honeycutt "would like to be involved in the creation of any agreements being negotiated," nor did he know that only TOS "corporate officers" can sign any booking, charter, or contractual agreement.

Concluding Findings

80.  TOS cloaked Sandifer with apparent authority to act in behalf
     of TOS, by recognizing and introducing him as the owner of
     TOS's Dallas office, and by insisting that everything about
     the office from its name to its phone number to its fax number
     to its stationery, should evidence that one dealing with the
     TOS Dallas office was, indeed, dealing with TOS itself.  By
     placing   in   its   Dallas   office   an   International   Manager
     expressly  authorized  by  TOS  to  perform  the  duties  of  a
     licensed  ocean  transportation  intermediary,  who  reported  to
     Sandifer  as  head  of  the  office,  TOS  further  endowed  Sandifer
     with  apparent  authority  to  bind  TOS  to  contracts  for  the
     carriage of ocean freight.

81.  TOS's  Vice  President  of  Sales  had  introduced  Sandifer  to
     Pearcy  as  the  owner  of  TOS's  Dallas  office.   Powell--whose  job
     was  to  perform  for  TOS's  Dallas  office  the  duties  customarily
     performed  in  the  industry  by  a  licensed  ocean  transportation
     intermediary--was  introduced  to  Pearcy  as  TOS's  International
     Manager  handling  ocean  freight,  and  Pearcy  was  told  that  he
     was  to  work  with  Powell,  who  reported  to  Sandifer.   In  that
     same  introductory  meeting,  Sandifer  in  the  presence  of  TOS's
     Vice  President  Buford,  assured  Pearcy  that  he,  Sandifer,  at
     the  end  of  the  day  made  the  decisions  and  that  if  Pearcy  had
     any  problems  in  his  ocean  freight  dealings,  Pearcy  should  come

22

to Sandifer.  There is no evidence that TOS's Vice President of Sales responded to qualify or limit Sandifer's statement, which was a further manifestation by Buford in behalf of TOS that Sandifer was the final authority in charge of ocean freight transportation for the Dallas office.

82. TOS cloaked Sandifer with apparent authority to sign a contract of affreightment in behalf of TOS in its Dallas office, which contract was in furtherance of TOS's core ocean transportation intermediary business.

83. Pearcy reasonably believed that Sandifer was authorized by TOS to execute the COA.

84. Powell in his dealings with OCI regarding the formation of the COA at all material times was acting as TOS's agent and within the scope of his actual authority as TOS's International Manager of its Dallas office who performed the duties customarily performed in the industry by a licensed ocean transportation intermediary.

85. Because Powell's dealings with OCI as TOS's agent in the formation of the COA were reasonably related to TOS's core business as a freight-forwarder and non-vessel operating common carrier licensed by the F.M.C. as an ocean transportation intermediary, and because the COA appeared to benefit TOS in fulfilling what TOS's representatives had related were to be TOS's obligations to Great American Silica

23

Company, there was no circumstance of such a nature as to require a reasonable person in the position of OCI's Pearcy to question Powell's authority to negotiate the terms of the COA.

86. OCI's Pearcy reasonably relied on Powell's actual authority to provide TOS's requirements for a COA to fulfill TOS's obligations on its Great American Silica contract.

87. OCI did not believe Powell's authority included signature authority on the COA because of TOS's previous introduction of Sandifer as the Owner of the Dallas office and the person to whom Powell reported; hence, OCI prepared the COA for execution not by Powell, but by Sandifer, whom TOS had cloaked with apparent authority to so act in the handling of TOS's Dallas office ocean freight business.

88. When TOS's employee Powell signed Sandifer's signature to the COA without Sandifer's authority, such was unknown to OCI, just as OCI had no reason to know that the purported signature of Sandifer was not in fact Sandifer's signature.

89. When TOS's Dallas office faxed back to OCI's office an executed signature page for the Contract of Affreightment bearing the purported signature of the head of TOS's Dallas office, OCI reasonably relied upon Sandifer's apparent authority to sign the negotiated COA, and believed Sandifer's signature was genuine.

24

90.  When Pearcy dated his own signature as OCI's president on June 5, 2009, and had in hand the executed signature page faxed to OCI by TOS on that date, a binding Contract of Affreightment was formed between TOS and OCI.

91.  A dispute arising out of or in connection with the COA exists between Overseas Carriers, Inc. and Team Ocean Services, Inc.

92.  The COA provides that the dispute between the parties shall be referred to arbitration in Houston, Texas, with United States law to apply.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.  The Court has jurisdiction of the parties and of the subject matter of this case pursuant to 28 U.S.C. § 1333.

2.  Contracts of Affreightment are maritime contracts. The Gothland, 64 U.S. 491, 493-94 (1859); Har-Win, Inc. v. Consol. Grain & Barge Co., 794 F.2d 985, 986-87 (5th Cir. 1986). As such, federal admiralty law applies to their interpretation. See Har-Win, 794 F.2d at 987.

3.  The Court has jurisdiction to determine whether the parties have agreed to arbitrate. See Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211, 218 (5th Cir. 2003) ("[B]ecause arbitration is a matter of contract, where a party contends that it has not signed any agreement to arbitrate,

the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration. We agree with those circuits which have included claims that the signature is forged or the agent lacked authority to bind the [principal] in this category.") (citations omitted); 9 U.S.C. § 4 ("A party aggrieved by the alleged . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.").

4.   "Although there is a strong federal policy favoring arbitration, 'this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" Will-Drill, 352 F.3d at 214 (quoting Fleetwood Enters. Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002)).

5.   "When interpreting a maritime contract, the general rules of contract construction and interpretation apply." Fitch Marine Transp., LLC v. Am. Commercial Lines, LLC, Civ. A. No. 09-4450, 2010 WL 2523062, at *4 (E.D. La. June 14, 2010)

*reconsideration denied in part*, Civ. A. No. 09-4450, 2010 WL 2998883 (E.D. La. July 27, 2010).

6.  Oral contracts of affreightment are valid under maritime law. <u>MTO Mar. Transp. Overseas, Inc. v. UMM Al Jawaby Petroleum Co., N.V.,</u> 624 F. Supp. 272, 276 (S.D. Tex. 1985) (Bue, J.), *aff'd* 837 F.2d 215 (5th Cir. 1988); <u>Orient Mid-East Lines v. Albert E. Bowen, Inc.,</u> 458 F.2d 572, 574 (2d Cir. 1972) (finding a binding oral contract of affreightment when parties agreed to all material terms and intended to be bound by the agreement).

7.  The common law of agency applies to admiralty cases.  West India Indus., Inc. v. Vance & Sons AMC-Jeep, 671 F.2d 1384, 1387 (5th Cir. 1982).

8.  Common law agency principles apply to acts committed by unlicensed agents of Non-Vessel Operating Common Carriers (NVOCCs). <u>Landstar Express Am., Inc. v. Fed. Mar. Comm'n</u>, 569 F.3d 493, 498 (D.C. Cir. 2009) ("If an agent breaches a contract or commits a tort, the disclosed NVOCC principal in whose name the agent acts is subject to liability.") (citing RESTATEMENT (THIRD) OF AGENCY §§ 6.01, 7.03 (2006); 46 C.F.R. § 515.4(b)(2) (Ocean Transportation Intermediary is "strictly responsible for the acts or omissions of any of its . . . agents rendered in connection with the conduct of its business.")).

27

9.    The Fifth Circuit looks to the Restatement of Agency as a
      source of general agency law to be applied in admiralty cases.
      *See* <u>Port Ship Serv., Inc. v. Int'l Ship Mgmt. & Agencies
      Serv., Inc.</u>, 800 F.2d 1418, 1420 (5th Cir. 1986).

10.   "When an agent acting with actual or apparent authority makes
      a contract on behalf of a disclosed principal . . . the
      principal and the third party are parties to the contract."
      RESTATEMENT (THIRD) OF AGENCY § 6.01.

11.   "An agent acts with actual authority when, at the time of
      taking action that has legal consequences for the principal,
      the agent reasonably believes, in accordance with the
      principal's manifestations to the agent, that the principal
      wishes the agent so to act." RESTATEMENT (THIRD) OF AGENCY § 2.01.

12.   "Apparent authority is the power held by an agent or other
      actor to affect a principal's legal relations with third
      parties when a third party reasonably believes the actor has
      authority to act on behalf of the principal and that belief is
      traceable to the principal's manifestations." RESTATEMENT
      (THIRD) OF AGENCY § 2.03.

13.   To create apparent authority, the principal must make some
      manifestation that "causes the third person to believe the
      agent is authorized to act for him or the principal should
      realize that his conduct is likely to create such a belief."

28

Cactus Pipe & Supply Co., Inc. v. M/V Montmartre, 756 F.2d 1103, 1111 (5th Cir. 1985) (affirming trial court's finding that vessel owner was not liable as carrier of cargo because there was no evidence that vessel owner authorized issuance of bills of lading either by actual or apparent authority). "An agent cannot confer authority upon himself." Id.

14. As to the third party, the presence of apparent authority "trumps restrictions that the principal has privately imposed on the agent." RESTATEMENT (THIRD) OF AGENCY § 2.03 comment c.

15. Manifestations by the principal of an agent's authority may take the form of expressive conduct, such as explicit statements that the principal makes to the third party, or by acts of the principal that render explicit verbal communication unnecessary. RESTATEMENT (THIRD) OF AGENCY § 3.03 comment b. Examples of manifestations include the principal's act of listing the agent as a representative of the principal, directing the agent to make statements to third parties, designating the agent to perform acts or conduct negotiations, placing the agent in a position within an organization, or placing the agent in charge of a transaction. Id. at § 2.03, comment c; Sunskar Ltd. v. CDII Trading, Inc., 828 F. Supp.2d 604, 618-619 (S.D.N.Y. 2011) (inexperienced agent with title of vice president who expended large amounts of time negotiating contracts with third party had apparent authority

29

to bind principal); <u>Cross Chartering N.V. v. R.I.P.C.</u>
<u>(Trinidad), Ltd.</u>, No. Civ. A. H-04-2264, 2005 WL 2921645, at
*15-16 (S.D. Tex. Nov. 2, 2005) (Rosenthal, J.) (finding
apparent authority where the principals, agent, and third
party conducted a meeting, and thereafter the agent "handled
all further discussions and negotiations with [the plaintiff]
and ultimately drafted and executed the relevant contracts and
agreements"); <u>Action Marine, Inc. v. M/V Norseman</u>, No. Civ. A.
96-3945, 1998 WL 419718, at *5 (E.D. La. July 21, 1998)
(Berrigan, J.), *aff'd in part and reversed in part on other*
*grounds*, 189 F.3d 470 (5th Cir. 1999) (agent had apparent
authority to bind principal because the principal, the agent,
and the third party participated in a conference call
regarding the delay of the vessel and the need for repairs and
all correspondence between the agent and the third party was
on the principal's stationery).

16.  A circumstance that lends weight to an appearance of authority
     is the fact that an organization has placed an agent in charge
     of a geographically distinct unit or branch or of a specific
     function or activity.  Of significance are such matters as the
     nature of the organization and nature of the transaction,
     whether the branch manager makes decisions and directs
     activity without checking elsewhere in the organization, and
     whether the organization itself has given third parties reason

to believe that the branch manager has or lacks unilateral authority as to the transaction. RESTATEMENT (THIRD) OF AGENCY § 3.03 comment d; <u>Lanier v. Alenco</u>, 459 F.2d 689, 693 (5th Cir. 1972) (finding that the branch manager had apparent authority and that "it is not at all unreasonable that a prospective employee would not question the hiring authority of the branch manager of the plant in which he was to work, absent something in the negotiations or in the express and announced policies of the company that would reasonably lead him to suspect otherwise").

17. If a principal places a person in a position or office with specific functions or responsibilities, from which third parties will infer that the principal assents to acts by the person requisite to fulfilling the specific functions or responsibilities, the principal has manifested such assent to third parties. RESTATEMENT (THIRD) OF AGENCY § 1.03 comment b; <u>Thomas Reg. Directory Co., Inc. v. Dragon Prods., Ltd.</u>, 196 S.W.3d 424, 431-32 (Tex. App.--Beaumont 2006, pet. denied) (holding that the jury's finding of apparent authority was supported by some evidence where, *inter alia*, the principal provided the agent with an office and business cards in its name, a telephone line routed through its switchboard, and access to a computer and other equipment and allowed him to share an office with executives of the company).

31

18.  Whether a reasonable person in the position of a third party would believe that an agent has the authority or the right to do a particular act is ordinarily a question of fact, which is separate from the related question on whether such a belief is traceable to a manifestation of the principal.  RESTATEMENT (THIRD) OF AGENCY § 2.03 comment d.

19.  The customs or practices of a particular industry shape the context in which a third party observes the agent's conduct and, as well, bears upon the reasonableness of any belief by a third party that a particular agent has been authorized by the principal to do any particular act.  Id.  In the maritime context, customs of the shipping industry are instructive in analyzing whether a contract has been formed.  *See, e.g.*, Great Circle Lines, Ltd. v. Matheson & Co., Ltd., 681 F.2d 121, 125 (2d Cir. 1982) ("Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract").

20.  A third party's understanding of the principal's actions will reflect "general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties."  RESTATEMENT (THIRD) OF AGENCY § 2.03 comment c.

32

21.     "Absent circumstances that should raise questions in the mind
        of  a  reasonable  party,  as  a  general  matter  there  is  no
        requirement  that  the  third  party  inquire  into  the  scope  of
        an  agent's  authority."   RESTATEMENT (THIRD) OF AGENCY § 2.03
        comment  d.    Examples  of  circumstances  that  would  make  it
        reasonable  for  a  third  party  to  inquire  into  the  scope  of  an
        agent's  authority  include:  (1)  if  there  is  material  doubt
        about  a  written  statement  from  the  principal  specifying  what
        the  agent  is  authorized  to  do;  (2)  if  the  proposed  transaction
        does  not  appear  to  be  reasonably  related  to  the  principal's
        known  business;  or  (3)  if  the  proposed  transaction  would  not
        appear  to  benefit  the  principal.    <u>Id.</u>;  <i>see also</i> <u>Am. Nat'l Fire
        Ins. Co. v. Kenealy</u>,  72  F.3d  264,  269  (2d  Cir.  1995)  ("'[A]
        recovery  based  on  the  doctrine  of  apparent  authority  does  not
        require  that  the  third  party  have  inquired  into  the  scope  of
        the  agent's  authority;'  only  in  cases  where  seemingly  actual
        authority  is  placed  in  doubt  by  a  transaction  that  is
        'extraordinary'  or  patently  fraudulent  does  a  duty  to  inquire
        into  the  state  of  that  authority  arise"  (quotation  omitted));
        <i>cf.</i> <u>Karavos Compania Naviera S. A. v. Atlantica Exp. Corp.</u>,
        588  F.2d  1,  10-11  (2d  Cir.  1978)  (holding  that  plaintiff  had
        duty  to  inquire  because  he  was  not  justified  in  believing  the
        agent's  self-proclaimed  representations  of  authority;  he  had
        no  prior  dealings  with  the  company;  the  contract  was

extraordinary; and the identity of the principal "switched" midway through the transaction).

22. "[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority." Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 102 S. Ct. 1935, 1942 (1982) (citing Standard Surety & Cas. Co. v. Plantsville Nat'l Bank, 158 F.2d 422 (2d Cir. 1946), *cert. denied*, 67 S. Ct. 1203, (1947)); *see also* Gleason v. Seaboard Air Line Ry. Co., 49 S. Ct. 161, 162-63 (1929) (commenting that "few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own" and holding the principal liable for agent's forgery on a railroad bill of lading, even though agent forged the document to benefit himself).

23. "A principal is liable for the deceitful or fraudulent acts of its agents, which are committed in the course of the business the agent was appointed to carry out." Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 517 (8th Cir. 1984), *cert. denied*, 105 S. Ct. 565 (1984) (collecting cases). "Between a principal and a third party, the principal must bear the burden of an agent who has acted improperly." Id. at 518 (citations omitted); U.S. v. Sanchez, 521 F.2d 244, 246 (5th Cir. 1975), *cert. denied*, 97 S. Ct. 59 (1976) (holding that

34

"as between two innocent parties . . . the loss must be borne by [the principal]" when its agent fraudulently altered the powers of attorney granting him authority to act on the principal's behalf).

24. Ratification occurs when a party affirms an act done by another, whereby the act is given effect as if committed by an agent with actual authority.  A person ratifies an act by manifesting assent that the act shall affect his or her legal relations, or by conduct that justifies a reasonable assumption that he or she so consents.  RESTATEMENT (THIRD) OF AGENCY § 4.01.

25. "The sole requirement for ratification is a manifestation of assent or other conduct indicative of consent by the principal."  RESTATEMENT (THIRD) OF AGENCY § 4.01 comment b.

26. Jim Sandifer had apparent authority to act in behalf of TOS through its Dallas office to execute a maritime contract of affreightment with OCI.  (*See* FOF Nos. 12-15, 25, 31-34, 39, 40, 43, 45, 74-83, 85, 87-89).

27. OCI, and its principal Jim Pearcy, reasonably believed, in accordance with TOS's manifestations to Pearcy, that TOS wished Sandifer to act in its behalf in executing the maritime contract of affreightment.  (*See* id.).

28. Paul Powell had actual authority from TOS to perform the duties of an ocean transportation intermediary in TOS's Dallas office and, as such, to arrange the carriage of ocean freight for TOS and, in this instance, to act in TOS's behalf to state TOS's requirements and to negotiate the terms for a contract of affreightment to discharge TOS's obligations to Great American Silica Company. (*See* FOF Nos. 8, 9, 17-20, 27, 31, 33-38, 41, 61, 62, 81, 84-86).

29. In negotiating the terms for a contract of affreightment, OCI's Jim Pearcy reasonably believed that Powell was authorized to act in TOS's behalf to state TOS's requirements and to negotiate the terms for a contract of affreightment to discharge TOS's obligations to Great American Silica Company. (*See* FOF Nos. 20, 22, 31, 32, 35-38, 41, 49, 81, 84-86).

30. The Contract of Affreightment negotiated and formed was reasonably related to TOS's core business as a non-vessel operating common carrier licensed by the F.M.C. as an ocean transportation intermediary and which OCI reasonably believed would benefit TOS in discharging its obligations to Great American Silica Company. (*See* FOF Nos. 7-9, 17, 19, 20, 27, 28, 30-38, 40, 41, 57-62, 64, 65, 71, 76, 81, 84-86).

31. Powell's unauthorized and possibly deceitful or even fraudulent act in signing Jim Sandifer's name to bind TOS to the contract of affreightment was an act directly related to

Powell's role as TOS's International Manager in its Dallas office, where Powell had actual authority to perform the duties customarily performed in the industry by a licensed ocean transportation intermediary in furtherance of TOS's ocean freight business, and to work closely and coordinate ocean shipment transactions with the agents designated by TOS. (*See* FOF Nos. 8, 9, 17-20, 27, 31, 33-39, 41, 43-45, 49, 50, 52-57, 59, 61-64, 71-73, 81, 84-86).

32.  Although Powell acted improperly by signing Sandifer's name to the contract of affreightment, it is TOS, whose agent he was, that must bear the burden of Powell's improper act. *See* <u>U.S. v. Sanchez</u>, 521 F.2d 244, 246 (5th Cir. 1975), *cert. denied*, 97 S. Ct. 59 (1976).

33.  When TOS sent from its Dallas office fax machine to OCI its executed signature page on the contract of affreightment, which OCI received without any notice or knowledge that Sandifer's signature was not authentic or authorized, OCI reasonably relied upon that signature page and a Contract of Affreightment was formed between OCI and TOS. (*See* FOF Nos. 10, 12, 15, 22-25, 32, 37, 39, 40, 43-47, 69-85, 87-90).

34.  The Contract of Affreightment provides for arbitration in Houston, Texas, in accordance with United States law, if a dispute arises out of or in connection with the Contract of Affreightment. (*See* FOF Nos. 42, 90-92).

35.   The Federal Arbitration Act (FAA) states:

> A written provision *in any maritime transaction* or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

36.   The Contract of Affreightment is a maritime contract and therefore falls under the purview of the FAA, even if the contract does not specifically mention the FAA.

37.   Plaintiff OCI is entitled to a judgment compelling TOS to proceed together with OCI to arbitration in Houston, Texas, to resolve the dispute between the parties that has arisen out of and is related to the Contract of Affreightment.

38.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

## ORDER

For the reasons set forth in the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED that Defendant Team Ocean Services, Inc., in accordance with the Contract of Affreightment between the parties dated June 5, 2009, and the Federal Arbitration Act, shall forthwith proceed to arbitration with Plaintiff Ocean Carriers, Inc. in Houston, Texas, to resolve the dispute(s) between the parties that has arisen out of and is related to the Contract of Affreightment.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 4th day of January, 2013.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE